IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALI BEHROZ AZIZ, *et al.*

    Plaintiffs,

    v.

BEZHAN AZIZ,

    Defendant.

Civil Action No. 22-2834-BAH

(FILED UNDER SEAL)

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SEALED MEMORANDUM OPINION[1]

Pending before this Court are several motions, including plaintiffs Ali Behroz Aziz and Shinkay Aziz's ("Plaintiffs") motion to reopen the case, ECF 54, defendant Bezhan Aziz's ("Defendant") motion to strike, ECF 55, and motion to enforce the settlement agreement, ECF 58, as well as Plaintiffs' emergency request for a status conference, ECF 59. For the reasons stated herein, Plaintiff's motion to reopen the case is DENIED, Defendant's motion to enforce the settlement agreement is GRANTED,[2] and Plaintiffs' emergency request for a conference and Defendant's motion to strike are DENIED as moot.

---

[1] Nearly all filings related to this opinion are filed under seal, likely to protect the confidentiality of the settlement agreement as well as to honor the attorney/client privilege as well as the spirit and letter of Fed. R. Evid. 408. Though the Court has carefully drafted this opinion to avoid sensitive material, it will be initially filed under seal. The parties shall have fourteen (14) days from its issuance to file a position on what portions of the opinion must remain under seal. The Court intends to issue a public version of this opinion with necessary redactions after reviewing any submissions from the parties. The Court's accompanying implementing Order will not be filed under seal.

[2] As noted, *infra*, Defendant has complied with the terms of the settlement agreement and the case previously closed pursuant to Loc. R. 111. Thus, there is some question as to what aspects of the agreement are left to enforce. The Court has reviewed the executed settlement agreement, *see* ECF 56-7, at 2-10, and notes that there remain additional provisions including clauses addressing non-disparagement, confidentiality, and liquidated damages in the event of a breach of the agreement. *Id.* at 3. Accordingly, the Court grants Defendant's motion to enforce the agreement (ECF 58) and the remaining aspects of the settlement agreement remain in full force and effect.

## I.   BACKGROUND

The Court will briefly summarize the relevant background and factual allegations as articulated in Plaintiffs' complaint and as detailed in the filings currently before the Court. Plaintiffs, who are the older brother and mother of the Defendant, now reside in Germany. ECF 1, at 2. They previously lived in Afghanistan before fleeing the country to avoid retaliation for Plaintiffs' work with the United States Army and "an international organization." *Id.* At the time of the events giving rise to this litigation, Defendant lived in Silver Spring, Maryland. *Id.* Fearing that "Kabul would soon fall to the Taliban," Plaintiffs made efforts to move their funds out of a bank in Afghanistan in the Spring of 2001. *Id.* However, Plaintiffs allege that they were unable to directly transfer funds "from Afghanistan to European countries, such as Germany," and similarly could not freely transfer funds from Afghanistan to the United States unless they provided a "legitimate reason" for the transfer. *Id.* at 2-3. Plaintiffs allege that Defendant offered to help them move their savings out of Afghanistan to their home in Germany by providing the required justification for the transfer, opening a bank account in the United States to accept the transfer, and promising to immediately transfer the money to an account in Germany controlled by Plaintiffs once Defendant received the funds. *Id.* at 3.

After an initial effort to transfer the funds failed,[3] Plaintiffs allege that Defendant "suggested the pretext of claiming that the funds were needed to help [Defendant] to purchase a home" in the United States. ECF 1, at 4. To that end, Plaintiffs allege that Defendant "created false documents" in support of that claim," which Plaintiffs attach to their complaint. *Id.* at 4.

---

[3] The initial effort to transfer funds was based on Defendant's allegedly false representation that the funds were needed for "business purposes," namely to pay an invoice purportedly owed by Defendant's company to another company. ECF 1, at 3. This effort failed when the bank in Afghanistan discovered that the license for Defendant's business had expired. *Id.* at 4.

2

Plaintiffs allege that they agreed to go along the plan as they were "desperate to get [their] life savings out of the embattled country and [had] no other option for the funds to leave the country."[4] *Id.* Plaintiffs' bank in Afghanistan permitted the transfer, and $189,000 was allegedly transferred to Defendant's bank account in the United States. *Id.* Contrary to the representations made to the bank in Afghanistan (but purportedly in accord with the ruse agreed to by Plaintiffs), Defendant did not use the funds to purchase a home. *Id.* at 5. However, Plaintiffs allege that Defendant "failed and refused to return Plaintiffs' funds" and instead "made use of those funds to his personal benefit." *Id.* at 4-5. When Plaintiffs threatened to take legal action to secure their seemingly lost money, Plaintiffs allege that Defendant sent them emails in 2022 outlining Defendant's "plan to abuse the law and process" to prolong any litigation and force Plaintiffs to settle. ECF 54, at 3-5.

On November 4, 2022, Plaintiffs commenced an action for unjust enrichment and fraud seeking $189,000 in compensatory and punitive damages. ECF 1, at 6-7. Defendant filed an answer on March 24, 2023, in which he disputed Plaintiffs' version of the events and claimed that the funds "were expressly designated as a gift for Defendant to buy himself a home." ECF 15, at 2. On October 25, 2024, the parties jointly requested a referral to a magistrate judge for mediation, *see* ECF 25, and the case was referred to United States Magistrate Judge Gina Simms for that purpose, *see* ECF 26. The docket reflects that the parties held a telephone conference before Judge

---

[4] Plaintiffs allege that "[t]he false statement was necessary as it was the only way Plaintiffs' funds could leave Afghanistan." ECF 1, at 5. Plaintiffs further allege that:

> At the time, the Taliban offensive, which began in early 2021, was quickly approaching Kabul and there was panic in the city. There had already been numerous targeted killings constantly of persons (such as [Plaintiff Ali Behroz Aziz]) who had assisted the United States military. [Plaintiff] Ali [Berhoz Aziz] was despised by the Taliban and looked upon as a traitor because of his affiliation with the United States Army in Afghanistan, and he reasonably feared for his life if he were to fall into the hands of the Taliban.

*Id.*

3

Simms on January 18, 2024, *see* ECF 28, and met for a settlement conference on March 7, 2024, *see* ECF 31. The parties held another telephone conference related to settlement on March 29, 2024 and participated in multiple subsequent discussions related to settlement over the summer of 2024, *see* ECFs 35, 36, 38.

On August 5, 2024, the parties advised the Court that they had reached an agreement to settle all claims and the Court entered an order dismissing the case pursuant to Local Rule 111.[5] *See* ECF 37. However, on August 30, 2024, Plaintiffs filed a motion for extension of time to seek to reopen the case, ECF 42, which the Court granted on September 4, ECF 49. A week later, on September 12, 2024, Plaintiffs filed a motion to reopen the case. *See* ECF 54. In response, Defendant filed a motion to strike Plaintiffs' motion to reopen, ECF 55, a response in opposition to Plaintiffs' motion to reopen, ECF 56, and a motion to enforce the settlement agreement, ECF 58.

Plaintiffs do not dispute that the case was settled after mediation and repeatedly acknowledge that they "signed the settlement agreement.'" *See* ECF 54, at 1, 2, 41, 54, 55.[6]

---

[5] Local Rule 111, entitled "Settlement Orders," provides for the following:

> When the Court has been notified by counsel that a case has been settled, the Court may enter an order dismissing the case and providing for the payment of costs. Such an order of dismissal shall be without prejudice to the right of a party to move for good cause to reopen the case within a time set by the Court if the settlement is not consummated. Alternatively, the Court, upon being notified by counsel that a case has been settled, may require counsel to submit within sixty (60) days a proposed order providing for settlement, in default of which the Court may enter such judgment or other order as may be deemed appropriate. An order entered pursuant to this Rule means that the entire case, including all claims, counterclaims, cross-claims, third-party claims, and claims for attorneys' fees and costs has been settled, unless otherwise stated in the order.

Loc. R. 111.

[6] Plaintiffs attach an unsigned copy of a "Settlement Agreement and Mutual Release" to the motion to reopen. ECF 54-2, at 8-13. Plaintiffs' copy does not appear to be the final version of the agreement as its terms do not comport with Plaintiffs' own summary of the terms of the challenged

4

Plaintiffs also acknowledge that they "received part of [their] funds" pursuant to the settlement agreement, which the Court construes as an admission that they received all of the money they were supposed to receive under the terms of the settlement agreement, but less than what they initially demanded in their complaint. ECF 54, at 2. Despite signing the settlement agreement (and receiving funds from Defendant as required under its terms), Plaintiffs request that the case be reopened on the grounds that they signed the settlement agreement "under pure duress [and] threats" and due to "abuse of process by the defendant." ECF 54, at 1. Moreover, Plaintiffs claim that the Defendant "fabricate[d]" and threatened to use "fraudulent affidavits" during the course of the litigation, and encourage the Court to set aside the settlement agreement on that basis.[7] *Id.* at 2. Plaintiffs allege that Defendant was not truthful in discovery and "lied under oath," and further allege that Defendant admitted in a recorded statement that "the funds were not a gift." *Id.* at 28.

In an effort to explain why they signed the agreement and accepted Defendant's payment, Plaintiffs allege that once they received the funds from Defendant pursuant to the settlement

---

settlement agreement. Defendant attaches a signed copy of a "Confidential Settlement Agreement and Mutual General Release" (and an amendment thereto) that appears to be the final agreement signed by all parties on July 30, 2024. ECF 56-7, at 2-10. Plaintiffs do not challenge the authenticity of the settlement agreement at ECF 56-7 and affirm that they received the funds promised to them under that signed agreement. ECF 59, at 3.

[7] The affidavits in question were offered by Defendant's father and younger brother in support of Defendant's account of the events that led to the lawsuit. Plaintiffs point to the formulaic language of both documents, which they take to mean that the affidavits were "tailor-made" and "bogus in a way which is discernable." ECF 54, at 15 ¶ 18. Both documents were purportedly authored in 2022 and are reproduced within the body of Plaintiffs' motion to reopen. *Id.* at 16-17. Plaintiffs also allege that Defendant procured false statements from these same witnesses to German authorities investigating the matter, which are also included in Plaintiffs' motion to reopen (and translated from German to English). *Id.* at 21-26.

agreement, they felt that "the existential threat which the defendant was posing" had concluded and so they "declared the settlement agreement as void and null." ECF 54, at 2.

Plaintiffs allege that their counsel[8] "was aware of the duress, undue influence, [and] threats," and was also aware of Plaintiffs' "financial situation and [the] fraudulent acts of the defendant[.]" *Id.* However, Plaintiffs contend that:

> [Counsel] saw no other solution, when the Montgomery Police Unit and District Attorney did not prosecute a clear criminal fraud case, the defendant fully in possession of our funds, given the fiercely expensive U.S. justice compiled with the defendant fraudulent actions, where falsehoods and lying under oath are something trivial for [Defendant]; he has the hutzpah to knowingly, willingly and with premeditation fabricate two affidavits to use them at the court of justice and threatened us with the fraudulent affidavits.

*Id.* at 2. "Therefore," Plaintiffs allege, "the settlement agreement is void and null." *Id.*

Plaintiffs also allege that the "settlement is further void because of undue influence," specifically because Plaintiffs are destitute, "could not afford food," owed attorney's fees, and thus had little choice but to sign the settlement agreement. ECF 54, at 36-37. They close their motion by summarizing the mediation process and noting alleged instances of pressure to settle the matter. *Id.* at 37-38. Plaintiffs recount the back-and-forth negotiations between counsel for all parties in which Defendant's counsel apparently backed away from an earlier tentative offer to settle the matter and noted that Defendant is now "unable to pay more than [what was ultimately the final settlement amount]." *Id.* at 39. Plaintiffs attach correspondence with their counsel from July 18, 2024, in which they agree to settle the matter for the final proposed amount but note that they are doing so "under sever [sic] duress and coercion" but nonetheless advise counsel to "[p]lease agree

---

[8] Plaintiffs now proceed pro se but were previously represented by counsel previously, including during the settlement negotiations and when the settlement agreement was signed. *See* ECF 49 (granting Plaintiffs' counsel's motion to withdraw filed on August 15, 2024, after the entry of the Rule 111 Order).

6

and finish this!" *Id.* at 39 (exclamation in original). Plaintiffs also include the text of an additional correspondence with counsel on July 22, 2024 in which they state, "[l]et's sign and finish this, please do not worry, this agreement is not enforceable on us. We are signing it against our wills, because only [Defendant] lies and uses economic duress policy keeping us on food stamps for more than two and [a] half years." *Id.* at 40. They provide additional text messages to friends, and affidavits affirming the authenticity of the texts, in which Plaintiffs share that they are "signing the settlement agreement under force, coercion and duress" and thus declaring that the agreements are "void and against [their] wills." *Id.* at 45-50.

In response, Defendant denies Plaintiffs' allegations and avers that the "settlement agreement was entered into by all parties knowingly and voluntarily and without duress, coercion, fraud, bad faith, or undue influence by Defendant." ECF 56, at 1.[9] Defendant alleges that the agreement was signed by Plaintiffs and witnessed by a third party on July 23, 2024, and countersigned by the Defendant on July 30, 2024. *Id.* at 2. Defendant contends that "[a]ll parties were represented by counsel for the duration of the case and in all matters concerning the Settlement Agreement and Amendment, which was finalized after several months working through [Judge Simms]." *Id.* Defendant states that the "settlement was consummated on August 5, 2024, when Defendant's law firm (on behalf of Defendant) wired to Plaintiffs' counsel the total Settlement Amount as set forth in the Settlement Agreement." *Id.* at 3. Defendant argues that there is no basis to invalidate the settlement because of Plaintiffs' "secret belief that they were somehow subject to duress, fraud, and coercion, which was never communicated or disclosed to Defendant." *Id.* at 21.

---

[9] Defendant later filed a corrected exhibit related to Exhibit A of ECF 56, namely a revised affidavit of Defendant Bezhan Aziz. *See* ECF 60 (filed September 30, 2024).

Plaintiffs filed no response to Defendant's motions and similarly filed no reply to Defendant's response to their motion to reopen. In asking the Court to hold an emergency status conference, Plaintiffs repeat the claim that "[t]he defendant has lied under oath earlier in his discoveries, produced fraudulent affidavits [] and ordered fraudulent, bogus and tailor-made witnesses to testify to this court, which the affidavits were provided to this court earlier in [Plaintiffs'] motion to reopen the case and invalidate the settlement agreement." ECF 59, at 2. Plaintiffs affirm in that filing that they received the exact amount called for in the settlement agreement, once again affirming the authenticity of the agreement attached to Defendant's filing. *Id.* at 4.

## II. <u>LEGAL STANDARD</u>

Though fashioned as a request to re-open the case, Plaintiffs' true intent is to seek the Court's permission to disregard the settlement agreement reached by the parties on July 30, 2024. The United States Court of Appeals for the Fourth Circuit has explicitly noted that "Courts should foster settlement in order to advantage the parties and promote 'great saving in judicial time and services.'" *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (quoting *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 740 (4th Cir. 1989)). Courts have "inherent authority, derived from their equity power, to enforce settlement agreements." *Williams v. Prof'l Transp. Inc.*, 388 F.3d 127, 131–32 (4th Cir. 2004) (citing Hensley v. Alcon Labs, Inc., 277 F.3d 535, 540 (4th Cir. 2002); *see also Lopez v. XTEL Constr. Grp.*, 796 F. Supp. 2d 693, 698 (D. Md. 2011). Before enforcing a settlement agreement, the Court "(1) must find that the parties reached a complete agreement and (2) must be able to determine its terms and conditions." *Hensley*, 277 F.3d at 540–41 (citations omitted). "If there is a factual dispute over the existence of an agreement, or over the agreement's terms, the district court may not enforce a settlement *summarily*." *Id.* at

8

541 (emphasis in original). In the instance of such a dispute over the existence of an agreement or its terms, a court must first "conduct a plenary hearing and make findings on the issue." *Williams*, 388 F.3d at 131-32. "If, however, a settlement agreement exists and its terms and conditions can be determined, as long as the excuse for nonperformance is comparatively unsubstantial, the court may enforce the agreement summarily." *Swift v. Frontier Airlines, Inc.*, 636 F. App'x 153, 156 (4th Cir. 2016) (per curiam). Importantly, "having second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement[.]" *Hensley*, 277 F.3d at 540 (quoting *Young v. FDIC*, 103 F.3d 1180, 1195 (4th Cir. 1997)).

The parties do not dispute the existence of the agreement or disagree about its terms. *See* ECF 56-7, at 2-10. Nor could they, as all appear to concede that they signed a settlement agreement and performed the obligations required under its terms, with Defendant paying a sum certain to Plaintiffs within the required time period and Plaintiffs agreeing to the entry of a Rule 111 Order dismissing the case. Accordingly, the Court may decide the question of enforcement without conducting an evidentiary hearing. *See Millner v. Norfolk & W. R. Co.*, 643 F.2d 1005, 1009 (4th Cir. 1981) ("A number of courts have recognized the authority of a trial court summarily to enforce a settlement agreement and to enter judgment based on that agreement without plenary hearing.").

Here, however, Plaintiffs allege that they were coerced into signing the agreement, thus rendering it null and void. In essence, Plaintiffs invoke contract law to argue that no agreement was actually reached between the parties. Courts construe settlement agreements according to "standard contract principles." *Lopez*, 796 F. Supp. 2d at 699; *Bradley v. Am. Household Inc.*, 373 F.3d 373, 380 (4th Cir. 2004). This is because "[a] valid settlement agreement is a type of contract." *Calabi v. Gov't Emps. Ins. Co.*, 728 A.2d 206, 208 (1999). Courts therefore look for "mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient

9

consideration" to determine whether formation of a contract has occurred. *CTI/DC, Inc. v. Selective Ins. Co. of America*, 392 F.3d 114, 123 (4th Cir. 2004). In Maryland, settlement agreements, like other contracts, "may be subject to rescission on a finding of fraud, duress, undue influence, or negligent misrepresentation in their making." *Turner v. Archer W. Contractors, LLC*, Civ. No. ELH-17-228, 2019 WL 2549433, at *7 (D. Md. June 19, 2019) (quoting *Hale v. Hale*, 503 A.2d 271, 274 (Md. App. 1986)). Contracts may also be deemed invalid if they are found to be procedurally and substantively unconscionable. *Id.* (citing *Stewart v. Stewart*, 76 A.3d 1221, 1232 (Md. App. 2013)).

### III. ANALYSIS

#### A. Formation and Interpretation

"In determining whether there was an enforceable contract," the Court must begin by analyzing "the essential prerequisite of mutual assent to the formation of a contract, which depends upon the parties' intent to be bound and the definiteness of terms in the letter of intent[.]" *Falls Garden Condo Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 107 A.3d 1183, 1190 (Md. 2015). Intent to be bound is established when "a party…voluntarily signs a contract" and thereby "agrees to be bound by the terms of that contract." *Walther v. Sovereign Bank*, 872 A.2d 735, 746 (Md. 2005). Maryland[10] courts apply the law of objective contract interpretation, which specifies that

---

[10] A federal court hearing an action based on diversity of citizenship applies the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Maryland courts have long applied the doctrine of *lex loci contractus*, meaning that "when determining the construction, validity, enforceability, or interpretation of a contract, [they] apply the law of the jurisdiction where the contract was made." *Cunningham v. Feinberg*, 107 A.3d 1194, 1204 (Md. 2015). The settlement agreement, as provided in ECF 56-7, stipulates that it "shall be governed by, and construed in accordance with, the laws of the State of Maryland, without giving effect to the principles of conflicts of laws thereof." ECF 56-7, at 5 ¶ 19. As the Parties agree that the settlement agreement was executed pursuant to the laws of Maryland, the Court will apply Maryland law to the interpretation of the agreement. *See CFPB v. Access Funding, LLC*, Civ. No. ELH-16-3759, 2019 WL 266280, at *8 n. 6 (D. Md. Jan. 18, 2019).

"clear and definite" language in an agreement "will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (quoting *Slice v. Carozza Props., Inc.*, 137 A.2d 687, 693 (Md. 1958)). The Court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement but rather, to 'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *General Motors Acceptance v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)).

It is undisputed that the Parties drafted and signed a complete and final settlement agreement. *See* ECF 54, at 54 (Plaintiffs noting "[w]e signed the settlement agreement under undue influence, where the defendant is holding of our funds and dictated the settlement agreement in an non-negotiable manner, where even a single word was not changed and could not be changed by us, so the settlement agreement is void because of undue influence."); ECF 56 at 2 (Defendant noting that "[o]n July 30, 2024, Defendant countersigned the Settlement Agreement."). Neither Plaintiffs nor Defendant contend that the agreement was in any way unsettled or contained indefinite terms. Indeed, Defendant asserts, and Plaintiff admits, that Defendant remitted the total agreed-upon amount to Plaintiffs on August 7, 2024, and that Plaintiffs have not returned the sum to Defendant or Defendant's counsel. *See* ECF 56, at 3 and ECF 54, at 2 ¶ 5. Therefore, at the time the Plaintiffs moved to reopen the case and set aside the settlement agreement on September 12, 2024, the agreement had already been executed. There can be no doubt, then, of the existence of a valid contract between the Parties.

Plaintiffs purport that, prior to signing the settlement agree, they indicated to their counsel (and apparently to others) their belief that "this agreement is not enforceable on us." ECF 54, at

40. However, this conclusory legal assertion is belied by the express language of the agreement itself, which expressly notes that despite Plaintiffs' contentions in its complaint, "to avoid the expense and inconvenience of protracted litigation, and without the admission of any liability, the Parties have decided to settle their disputes, claims, and potential claims." ECF 56-7, at 2. Moreover, the agreement states that "[e]ach Party acknowledges and stipulates that such Party has reached the terms of this settlement that forms the basis of this Agreement after thorough bargaining and negotiation, with the benefit of advice from legal counsel of such Party's own choosing, and that this Agreement represents a final and mutually agreeable compromise of the matters set forth herein." *Id.* at 5. Thus, notwithstanding Plaintiffs' alleged intent not to be bound, which does not appear to have been communicated to the Defendant or Defendant's counsel at the time the agreement was signed, the unambiguous language of the settlement agreement indicates that the Parties expressly "acknowledge and agree that they are entering in this agreement and signing the same voluntarily and knowingly and without duress, coercion, intimidation or force." ECF 56-7, at 6 ¶ 26. That Plaintiffs proverbially crossed their fingers behind their backs as they signed the agreement has no effect on the agreement's validity. As Maryland law looks to the objective language of the contract and not the subjective intent of the parties, Plaintiffs cannot attack the validity of the settlement agreement by merely alleging that they hoped it wasn't enforceable.

**B.     Duress**

Plaintiffs claim that, even if the settlement agreement was validly formed, it is still voidable due to duress. ECF 54, at 12 ¶ 14. Under Maryland law, duress consists of "[a] wrongful act or threat by the opposite party to the transaction," which induces "a state of mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment." *Rendelman v. State*, 927 A.2d 468, 483 n.17 (Md. App. 2007) (quoting *Meredith v. Talbot Cnty.*,

560 A.2d 599, 603 (Md. App. 1989)). Federal courts interpreting Maryland law have understood this definition to mean "a wrongful act which deprives an individual of the exercise of his free will." *TECH USA, Inc. v. Evans*, 592 F. Supp. 2d 852, 859 (D. Md. 2009) (quoting *Eckstein v. Eckstein*, 379 A.2d 757, 762 (Md. App. 1978)); *see also Employers Ins. of Wausau v. Bond*, Civ. No. HAR-90-1139, 1991 WL 8431, at *2 (D. Md. Jan. 25, 1991) (recognizing that under Maryland law, the definition of duress encompasses "an improper threat which leaves the victim with no reasonable alternative other than to execute the agreement"). "To be wrongful, however, acts which are in themselves lawful must be so oppressively used as to constitute an abuse of legal remedies." *Meredith*, 560 A.2d at 603 (citing *Food Fair Stores, Inc. v. Joy*, 389 A.2d 874, 881 (Md. 1978)).

          *i.*    *Plaintiffs' First Duress Claim- March 2022 Emails*

In their first duress claim, Plaintiffs fail to allege that Defendant's actions either deprived them of the exercise of their free will or left them with no reasonable alternative but to execute the settlement agreement. The basis for this claim stems from statements the Defendant made in certain email communications sent on March 26, 2022, such as "I will give 30, 40 or 50 percent of [the disputed funds] to any attorney who will take my case and continue it until the High court. I don't care, but you can't afford paying your lawyer's fees." ECF 54, at 3. In another email sent the same day, Defendant stated to Plaintiffs, in relevant part, "I want you to be reasonable. Don't think that you will win and could own all this money. Don't waste your time and money. We have to settle it. Thanks." *Id.* Plaintiffs construe these communications as attempts by Defendant to "extort" them through further "abuse of law and process." *Id.* at 3. In response, Defendant contends that these statements were not threats but "the truth" and argues that they do not meet the legal definition of duress. ECF 56, at 19.

13

Though Plaintiffs characterize the Defendant's statements as constituting attempts to collect a "ransom" and evincing ulterior "motives clear beyond any reasonable doubt," Plaintiffs do not supply evidence that suggests Defendant's conduct was either wrongful or meaningfully deprived them of their free will. ECF 54, at 3. Defendant's reference to Plaintiffs' financial situation and the costs of litigation does not constitute a wrongful action. *See MedSense, LLC v. Univ. Sys. of Maryland*, Civ. No. PWG-20-892, 2021 WL 3142004, at *11 (D. Md. July 26, 2021) (holding that "[f]inancial pressure or unequal bargaining power is insufficient to establish economic duress"). To be sure, Plaintiffs' filing paints a picture of poverty, noting that they receive "food stamps" and even providing the Court with photographs of their home to show their lack of furniture and other amenities. ECF 54, at 7-11. The Court recognizes that life appears to be difficult for Plaintiffs and thus Defendant's claims as to the cost of continuing litigation no doubt weighed on them. But this type of saber-rattling related to the costs of litigation is not uncommon in litigation and frequently provides the impetus to settle cases. Moreover, Plaintiffs fail to show how Defendant's email communications in early 2022 left them with no reasonable alternative but to enter into a settlement agreement over two years later. Plaintiffs' duress claim based on these communications is therefore unavailing.

### ii. *Plaintiffs' Second Duress Claim- Prolonging the Process*

Plaintiffs also claim that the Defendant caused duress by "maliciously prolonging the process, therefore putting pressure" on Plaintiffs to settle the case. ECF 54, at 38 ¶ 35. Though Plaintiffs characterize this allegation as constituting both "undue influence" and "economic duress," the Court will approach Plaintiff's claim as simply one of economic duress.[11] *Id.* at 37, ¶

---

[11] In contrast to duress, "undue influence" refers to situation in which "a party in whom another reposes confidence misuses that confidence to gain an advantage while the other has been made to feel that the party in question will not act against its welfare," *Lloyd v. Niceta*, 284 A.3d 808, 826

14

32. Economic duress is proved by "'(1) [a] wrongful act or threat' by the other party to the transaction, and (2) [] 'the complaining party [being] overwhelmed by fear and precluded from using free will or judgment.'" *Baltimore Cotton Duck, LLC v. Ins. Comm'r of the State of Maryland*, 303 A.3d 1024, 1039 (Md. App. 2023) (quoting *Meredith*, 560 A.2d at 603). "Mere stress of business" does not establish economic duress when the party against whom the allegation is brought "was not responsible for such circumstances." *Id.* (quoting *Shillman v. Hobstetter*, 241 A.2d 570, 578 (Md. 1968)).

Though this claim appears to be the inverse of Plaintiffs' first contention that Defendant threatened them by pushing them settle *too quickly*, it fails nonetheless. In connection with this claim, Plaintiffs appear to contend that their dire economic situation is, at least in part, the fault of the Defendant due to his retention of the funds they contend he was not entitled to. *See* ECF 54, at 14 ¶ 16. Plaintiffs also allege that Defendant was dishonest during stages of mediation and aver that he previously agreed to settle the case for a higher sum than he ultimately did. ECF 54, at 38-39. These claims do not meet the legal standard for economic duress. Plaintiffs do not claim that Defendant's purported actions caused them to be "overwhelmed by fear," *Meredith*, 560 A.2d at 603, but instead reflect that they felt that the Defendant was "putting pressure" on them. ECF 54. at 38, ¶ 35. This is not uncommon in litigation and fails to rise to the level of economic duress.

Nor do Plaintiffs show that they were "precluded from using free will or judgement." *Meredith*, 560 A.2d at 603. To the contrary, the record indicates that Plaintiffs exercise substantial agency throughout the course of this litigation. When Plaintiffs filed their case in November of

---

(Md. App. 2022) (quoting 28 Richard A. Lord, *Williston on Contracts* § 51:51 (4th ed. 2020)). Though undue influence and economic duress are interrelated, see *id.* at 827 n. 10, since Plaintiffs do not allege that Defendant abused the trust of a confidential relationship, an economic duress analysis is more appropriate for evaluating this element of Plaintiffs' argument.

15

2022, they received permission from Judge Boardman, to whom this case was previously assigned, to effect service through email and text message. ECF 11. Defendant ultimately answered and a scheduling order was entered by Judge Messitte, to whom the case was first transferred. ECF 16. The parties jointly sought extensions in the case, ECF 17, which the Court granted, ECF 18. Though there was a change in counsel for Defendant, this substitution was swift and did not appear to generate any delay. *See* ECFs 19-24. Soon after the case was transferred to the undersigned, Plaintiffs, with the consent of Defendant, requested that the matter be referred for mediation and asked for a delay in the discovery deadline if efforts to settle the case failed. ECF 25 (filed October 25, 2023). Counsel again asked for more time for settlement negotiations in March of 2024. ECF 32, at 1. As noted, the docket reflects that the parties engaged in a prolonged negotiation process, *see* ECFs 31, 35, 36, and 38, which, at minimum, suggests that Plaintiffs exhibited the ongoing ability to exercise their free will. *See Lloyd v. Niceta*, 284 A.3d 808, 827 (2022) (affirming the Circuit Court's finding that a Plaintiff's "act of engaging with his counsel in successfully negotiating changes to [an agreement] 'shows that he is an individual who was still exercising his free will.'"). As they have shown neither an overwhelming fear nor a lack of free will, Plaintiffs are unable claim the defense of duress.

C.  **Fraud**

Plaintiffs also suggest that the settlement agreement is void due to "misrepresentation" and Defendant's "usage of fraudulent witness statements." ECF 54, at 14 ¶ 1. In Maryland, fraud may also be grounds for rescission of contract and "encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement." *Turner*, 2019 WL 2549433 at *8 (citing *Sass v. Andrew*, 832 A.2d 247, 261 (Md. App. 2003)). To recover in a fraud action in Maryland, a plaintiff must show,

16

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Dominion Fin. Serv., LLC v. Pavlovsky*, 673 F. Supp. 3d 727, 747 (D. Md. 2023) (citing *Nails v. S & R, Inc.*, 639 A.2d 660, 664, 668 (Md. 1994)). While Maryland law allows a contract to be void in instances of fraud, recission is only available if "a party's *manifestation of assent* is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying." *Erie Ins. Co. v. WAWGD, Inc.*, Civ. No. EA-22-1783, 2024 WL 1856155, at *4 (D. Md. Apr. 29, 2024) (emphasis in original) (citing *Restatement (Second) of Contracts* §164(2) (1981)).

Plaintiffs allege that Defendant produced allegedly fraudulent affidavits in connection with the litigation of this matter. ECF 54, at 51. Even assuming that the statements in the affidavits are false, Defendant knew the statements were false, and that the affidavits were procured for the purpose of defrauding Plaintiffs, Plaintiffs fail to allege that they *relied* on the allegedly false affidavits in connection with settlement agreement negotiations. Plaintiffs do not argue that the allegedly fraudulent affidavits induced their assent to the settlement agreement; indeed, they appear to have known of the existence of the affidavits – and disclaimed their authenticity – in advance of the negotiation process and almost a year before the agreement was signed.[12] *See* ECF 54, at 14 ¶ 17. Plaintiffs' fraud claim therefore does not provide a valid basis for recission.

---

[12] Plaintiffs note that the affiants were promised money "in return for their fraudulent affidavits." ECF 54, at 14 ¶ 17. These affidavits are dated March 18, 2022. *Id.* at 16-17. Plaintiffs further aver that the allegedly false affidavits "were provided to [Plaintiffs] by [D]efendant's former counsel," *id.* at ¶ 17, who withdrew from the case in September of 2023, *see* ECF 20. Thus, Plaintiffs were in possession of the affidavits and aware of their alleged false contents before the matter was referred for mediation and nearly a year before the settlement agreement was signed.

17

## IV. CONCLUSION

The Court is sympathetic to Plaintiffs' position as the process of negotiating and settling cases is undoubtedly taxing. Assuming Plaintiffs' representation that they live in poverty to be true, it is understandable that the failure to recover the full amount of their alleged losses yields frustration, if not anger. However, in the Court's experience it is often the case that one or, more typically, *both* sides are unhappy with some aspect of a settlement agreement. Plaintiffs acknowledge that they reached a complete agreement with Defendant that had no ambiguity as to its terms and conditions. As the agreement required, Defendant paid a sum to Plaintiffs and the case was dismissed. At its core, Plaintiffs' motion to reopen does not address the validity of the settlement agreement but is better described as an attempt to relitigate aspects of a case that has already settled. Therefore, Plaintiffs' motion to reopen the case is **DENIED**, Defendant's motion to enforce the settlement agreement is **GRANTED**, and Defendant's motion to strike, as well as Plaintiffs' request for a status conference, are **DENIED** as moot.

Dated: <u>October 21, 2024</u>

<u>          /s/          </u>
Brendan A. Hurson
United States District Judge